IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

DALE MICHELE STINGLEY                                                            PLAINTIFF

VS.                                                            CIVIL ACTION NO. 3:18-cv-656-FKB

MAC HAIK CHRYSLER JEEP
DODGE RAM and MAC HAIK
ENTERPRISES                                                                      DEFENDANTS

**ORDER**

Dale Michele Stingley worked as a sales associate at the Mac Haik Chrysler Jeep Dodge Ram (Mac Haik) dealership in Flowood, Mississippi, from August 28, 2017, until her resignation on February 16, 2018.  She brings this action under Title VII alleging that Mac Haik retaliated against her for engaging in activity protected by Title VII, discriminated against her on the basis of race and gender, and subjected her to a hostile work environment.  Stingley is proceeding *pro se*.  Presently before the Court is Defendants' motion for summary judgment.  [61].  Having considered the memoranda and submissions of the parties, the Court finds that the motion should be granted in part and denied in part.

**I. Facts and Procedural History**

The facts, established by the competent summary-judgment evidence and taken in the light most favorable to Stingley, are as follows.  Stingley, who is African-American, was a female sales representative at the dealership.  Early in her employment, she was asked to participate in a corporate investigation of discrimination charges that had been made by another African-American employee, Tameka Burnett

(the Burnett investigation).  The charges concerned Tony Taylor, a white male who was the used-car sales manager.  Stingley voiced her unwillingness to participate, saying that she had not been at the dealership for long and did not want to get involved.  Nevertheless, feeling pressured to cooperate, she attended a meeting regarding the matter.  Three other persons were present:  Stacey Brown, a white female who was the human resources (HR) director from corporate headquarters in Houston, Texas; Jeff Jeans, a white male and a private HR consultant hired by Mac Haik; and Darla Brumley, a white female and the HR officer for the local Mac Haik dealerships.  In the meeting, Stingley was asked if she thought Taylor was a racist.  She responded that she was not prepared to say that he was a racist, but she did give her opinion that Taylor had a problem with assertive black women.  [64] at 3.

According to Stingley, immediately after the meeting, she began experiencing problems at work.  Her weekly paycheck was lower than it should have been.  Brumley, who did payroll and whom Stingley describes as a friend of Taylor, failed to correct her paycheck for almost month, but Stingley admits that Brumley corrected it. *Id*. at 4, [61-5] at 4.  Also, her commission of $1174 on one sale (the Rushing deal) was not included in a commissions check.  [64] at 4-5.  Stingley claims that she was never paid the full commission on the Rushing deal.

Stingley became the subject of what she perceived as harassment and abusive behavior by Taylor, whom Stingley believes was told by Brumley of the statement Stingley had made during the Burnett investigation.  On one occasion in November of 2017, Taylor joined in a conversation Stingley was having with Jon Moody, the sales

2

manager.  Stingley challenged Taylor's participation in the conversation and remarked that Taylor didn't like her.  Taylor responded by saying that he was "sick of this discrimination shit." *Id*. at 5.  The next day, Brumley called Stingley and reported that someone had filed a corporate complaint against her.  Brumley would not reveal the name of the complainant, but Stingley believed it to be Taylor.  *Id*. at 5.  On another occasion when Stingley asked Taylor a question and then a follow-up question, Taylor responded by saying, in the presence of two other salespersons, that Stingley would "argue with a f****ing stop sign." *Id*. at 8.

Taylor also began taking excessive amounts of time to process paperwork on Stingley's sales.  According to Stingley, delays can cause customers to change their minds or leave the dealership, and she states that Taylor's actions affected her sales. *Id*. at 6, 7, 13.  However, she has provided no evidence of any specific sale that was lost.

Other managers at Mac Haik caused Stingley difficulties.  Jon Moody, a white male, came to the dealership in November of 2017 as the new-car sales manager. Stingley initially worked well with Moody, but over time, the relationship deteriorated.  At one point, Moody told Stingley that he would give her and Larry Snow each a $300 commission for the sales of two Dodge Hellcat vehicles, which had been sold by Tameka Burnett, who was no longer employed at the dealership.  *Id*. at 13.  However, Moody and Will LaGrange, the sales manager, decided to split Stingley's commission between her and Will Temple, a white male.  *Id.*; [61-5] at 5-10.  Moody also had a practice of responding to Stingley's questions or suggestions by yelling at her in the

3

presence of coworkers and customers.  Stingley says that Moody never spoke with male employees in this manner.  Stingley estimates that Moody yelled at her and demeaned her on at least ten occasions.  *Id*. at 23.  Stingley also alleges inappropriate conduct on the part of Moody.  On one occasion Moody referred to her, in front of Moody's wife, as "the only other woman in his life;" he once told her, when she offered a handshake, that he wanted a hug; and on another occasion he gave her an unwelcome hug and kissed her on the jaw.  [64-2] at 5, 39.  He also told a joke in which the punchline was, "because his balls were sore."  [64] at 9-10.  Finally, Stingley contends that she should have been awarded a cruise that was awarded secretly to another employee.

  Will LaGrange, a white male, was the general sales manager at the dealership.  Stingley claims that LaGrange ignored her complaints about Moody's behavior. She also explains that during the relevant time period, she was the only female salesperson and that in sales meetings, LaGrange regularly used the "F word," and on one occasion when sales were down, he instructed the sales team, "balls to the walls."  *Id*. at 9.  Stingley also states that although LaGrange typically handed out bonus checks to other salespersons at sales meetings, he would deny her recognition by waiting until after the meeting and leaving her check at her desk.  *Id*. at 14-15.  One evening after dark in December, Stingley left a trade-in vehicle out front for the night instead of taking it to the back lot, which was poorly lit.  LaGrange sent her a message the next day informing her that she would lose bonus money if she ever left a car out front again.  *Id*. at 14.  Stingley says a male sales representative had left a trade-in vehicle out front three days

earlier and was not reprimanded.  *Id.*  Finally, Stingley contends that LaGrange exhibited a dismissive attitude concerning an incident at the Jackson dealership. Stingley was sent to the dealership to pick up a vehicle and was told by LaGrange that she did not need to call first.  When she arrived at the dealership, an employee, Mike Parker, was rude to her, apparently upset that she had not called first.  When Stingley reported this incident to LaGrange, he was dismissive of the incident, telling her to "let it go" and observing that "some people are a\*\*holes."  [61-5] at 19.[1]

At some point, Stingley contacted Brown about Moody's behavior toward her, and Brown and Jeff Jeans came to the dealership to investigate.  Stingley claims that their actions during the investigation exacerbated the already-hostile conditions; however, the only specifics she gives are that Jeans told her she was difficult to work with, that he used a "yelling tone" with her, and that he insisted the kiss on the jaw by Moody had "never happened."  [64] at 10-11.

On February 16, 2018, Stingley was working with customers who spoke very little English, and she asked Moody for assistance.  Moody responded by yelling across the dealership floor that she just needed to do her job.  *Id*. at 16.  That same day, Stingley posted a note on her computer stating, "I quit," and left the dealership.

Believing that she had been discriminated against on account of her race and gender and retaliated against because of her participation in a discrimination investigation, Stingley filed a charge of discrimination with the Equal Employment

---

[1] The manager of the Jackson dealership later called Stingley and apologized for the incident. [61-5] at 20.

Opportunity Commission (EEOC) on April 5, 2018.  After receiving notice of her right to sue, she brought this action.

## II.  Summary Judgment Standard

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when evidence reveals there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  To oppose the motion, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (citation and internal quotation marks omitted).  In reviewing the evidence, the court is to resolve factual controversies in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  The court "must draw all reasonable inferences in favor of the non-moving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

**III. Evidence and Claims Considered**

In responding to the motion, Stingley has relied upon some allegations for which she has failed to produce competent summary judgment evidence.  For example, she sometimes refers to allegations made in her complaint but presents no sworn testimony or affidavit to support them.  Allegations in pleadings are not evidence. *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).  Furthermore, some of the documents attached to her response, most notably documents purporting to be copies of Facebook posts by Tony Taylor and Jeff Jeans, are not competent evidence because they are unauthenticated.  [64-2] at 2-3, 6, 31-33.  Although *pro se* plaintiffs are afforded leniency, they must nonetheless submit competent evidence to oppose a motion for summary judgment. *United States v. Cabelka*, 766 F. App'x 57, 60 (5th Cir. 2019).  In ruling on Mac Haik's motion, the Court has disregarded unsupported factual allegations and documents that do not constitute competent summary judgment proof.  However, because Stingley's response to the motion is verified, the Court has considered as evidence those statements in the response that appear to be based on her personal knowledge.

Furthermore, the Court has considered only those claims or arguments raised in Stingley's response to the motion.  All others are considered to have been abandoned. *See Black v. North Panola School Dist.*, 461 F.3d 584, 588 n. 1 (5th Cir. 2006) (finding failure to pursue a claim beyond the complaint constituted abandonment); *Essinger v. Liberty Mut. Fire Ins. Co.,* 529 F.3d 264, 271 (5th Cir.2008) (finding that plaintiffs had

abandoned claim for tortious breach of contract when summary judgment response was limited to bad faith claim).

## III.  Analysis

### A.  Retaliation

Title VII makes it unlawful for an employer to discriminate against an employee because the employee "has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under" Title VII.  42 U.S.C. § 2000e-3(a).  Stingley maintains that Mac Haik violated this provision by retaliating against her for her participation in the Burnett investigation.  She contends that Brumley's delay in correcting her payroll issues was motivated by Brumley's desire to retaliate against Stingley for her comment about Tony Taylor, who was Brumley's friend.  Stingley also suggests that the omission of the Rushing commission from her commission check was caused by Brumley for this same reason.  Stingley argues that certain aspects of Taylor's behavior towards her represented retaliation for her comment about him.  Finally, she says that LaGrange's failure to prevent or remedy these actions was itself a retaliatory act.

In ruling on a motion for summary judgment in a retaliation case based upon circumstantial evidence, a court follows the familiar burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972).  This approach requires a court first to determine whether the plaintiff has established a prima facie case.  If the court concludes that the plaintiff has done so, then the burden shifts to the defendant to

8

articulate legitimate, non-discriminatory reasons for the challenged conduct.  *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).  The plaintiff then has the burden of coming forward with evidence sufficient to create a genuine issue of material fact either that the defendant's reason is not true but is instead a mere pretext for a retaliatory motive, or that it is only one of the reasons for its conduct, and that another motivating factor was the plaintiff's protected activity.  *Id.*

To establish a prima facie case of retaliation, Stingley must show that (1) she engaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action.  *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015).  Protected activity can consist of (1) "oppos[ing] any practice made an unlawful employment practice by [Title VII]," or (2) "ma[king] a charge, testif[ying], assis[ting], or participat[ing] in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).

Stingley attempts to fit her claim within the second of these alternatives, the "participation clause," because of her participation in Mac Haik's investigation of Tameka Burnett's allegations.  However, this clause does not cover participation in an employer's internal investigation that is unrelated to an EEOC proceeding.  *E.E.O.C. v. Rite Way Serv., Inc.*, 819 F.3d 235, 239 n. 2 (5th Cir. 2016); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 428 (5th Cir. 2000).  According to Stingley's description of the meeting regarding the Burnett investigation, only Mac Haik HR personnel were involved,

and it appears to have been held before Burnett had even filed her EEOC charge.[2] Stingley has come forward with no competent summary judgment evidence that the investigation in which she participated was related to an EEOC proceeding. Thus, she has failed to establish an essential element of a prima facie case of retaliation.[3]

### B. Race and Gender Discrimination

Discrimination cases also fall within the *McDonnell-Douglass* burden-shifting framework for analysis. To establish a prima facie case, Stingley must show (1) that she is a member of a protected class; (2) that she was qualified for her job; (3) that she suffered an adverse employment action; and (4) that an individual outside of her protected group was treated more favorably under nearly identical circumstances. *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007).

In her response, Stingley identifies the following incidents which she alleges constituted race and/or gender discrimination: Moody's failure to pay her the entire $300 commission on Tameka Burnett's Dodge Hellcat vehicle sale and his giving a portion of it to Will Temple, a white male; management's failure to award her the cruise; Taylor's delays in processing paperwork on her sales; Brumley's failure to correct

---

[2] Stingley states that the first meeting was held in "late September" or "early October" of 2017. [64-2] at 12; [64] at 4. A copy of Burnett's EEOC charge, included in Stingley's exhibits, is dated October 16, 2017. [64-2] at 26.

[3] In her amended complaint, Stingley claimed that her employers also retaliated against her for her own complaints raised to the corporate HR department in January of 2018. The retaliatory actions identified by her and for which she has presented evidence are Jeans' and Brown's hostility during their meeting with her after her complaints. In their brief in support of their motion, Defendants argue that Stingley has failed to establish a prima facie case for this claim. In her response, Stingley has neither addressed their arguments nor even mentioned this second retaliation claim. Accordingly, the Court considers it to have been abandoned. *See Black*, 461 F.3d at 588 n. 1; *Essinger,* 529 F.3d at 271. Moreover, this claim would necessarily fail because, as Defendants point out, none of the actions she describes constitutes an adverse employment action.

promptly the problems with her pay; Brumley's failure to pay the full $1174 commission on the Rushing deal; LaGrange's reprimand of her for leaving a trade-in vehicle out front overnight and his failure to pass out her bonus checks in sales meetings; and Brown's and Jeans' hostile treatment toward her during the investigation regarding her own complaints.

The third prong of the analysis for a prima facie case of discrimination requires proof of an adverse employment action.  "[A]dverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *McCoy*, 492 F.3d at 559 (quoting *Green v. Adm'rs of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002)).  Most of the incidents identified by Stingley do not meet this definition. The only incidents arguably falling into this category were those that resulted in decreased compensation:  The decision by Moody and LaGrange not to pay her the entire $300 commission on Tameka Burnett's Hellcat sale, Brumley's failure to pay her the full $1174 commission on the Rushing deal, and management's failure to award her a cruise to which she believed herself entitled.

Stingley claims that she was a "top performer" at the dealership, "selling 20 [cars] a month consistently."  [61-5] at 6.[4]  And she only claims to have been shorted on pay two times, specifically, $150 on Tameka Burnett's Hellcat sale and failure to pay her the full Rushing commission. Her own testimony does not support that either of these were

---

[4] Although Stingley claims to have been a "top performer," she has failed to present evidence showing her sales and commissions in comparison to the sales and commissions of other salespersons at the dealership.

the result of race or gender discrimination, and she has failed to present any evidence supporting that they were. [cite case]

Based on Stingley's testimony, Tameka Burnett, prior to leaving Mac Haik, had sold two Dodge Hellcat vehicles, and since Burnett was no longer at the dealership, the sales commissions would be given to other Mac Haik salespersons. [61-5] at 8. Stingley testified that at one point, Moody told her that he would give one of the $300 commissions to Larry Snow, an African-American male salesperson, and the other to her. *Id*. at 5, 8. But whereas Larry Snow received the full $300 commission on one of the Hellcat sales, Moody and LaGrange decided that the other $300 commission should be split between Stingley and Will Temple, a white male. *Id*. Although Stingley claims that the decision was the result of race and/or gender discrimination, she admitted that she never met or spoke to the Hellcat customer and had no involvement in the sale. *Id*. at 5-9. And but for Moody selecting her, Stingley would not have received any portion of Burnett's Hellcat sales commissions.[5] Stingley has simply failed to present evidence supporting that the decision to pay her $150, instead of $300, from Burnett's Dodge Hellcat sales commissions was the result of race or gender discrimination.

Stingley did not include her claim about the $1174 Rushing commission in her original complaint or amended complaint. *See* [1], [59]. Instead, she raised it for the first time before the Court in her response to Mac Haik's summary judgment motion.[6]

---

[5] Although Stingley claims that Moody selected her because she was "a top performer," [61-5] at 5, she has presented no evidence showing that she was "a top performer" or how many salespersons at the dealership were "a top performer," or that she was somehow entitled to the full $300 commission.

[6] Since Stingley raises this claim for the first time in her response, it is not properly before the Court. However, there is some indication that in such a situation, especially where the plaintiff is *pro se*, the court should treat the raising of a new allegation as a motion to amend. *See Underwood v. Miss. Dep't of*

Stingley's assertions about the Rushing commission are vague, inconsistent, and lack detail. In her response, she claims that "one $1174 commission . . . was missing from a commission check," that she "had an issue with a commission pay on one of her sales [and] . . . [t]hat check should have been $1174," and that she "was never paid the $1174 on the Rushing deal."  [64] at 4-7. But in her EEOC complaint, she stated that she was only shorted $400 on the Rushing commission. [64-2] at 4. Stingley directs all of her complaints about the Rushing commission at Darla Brumley, who was in charge of payroll.  *See* [64] at 4-7, 13-14. She contends that Brumley failed to pay her the full Rushing commission in retaliation for Stingley's negative comment about Taylor, Brumley's friend, in Mac Haik's internal investigation of the Burnett matter.  *Id*. at 4-7. As addressed above, Stingley has no legally cognizable retaliation claim. And evidence submitted by Stingley indicates that the Rushing commission issue arose from the sale having been "kicked back by [a] finance company and returned to the dealership."  *See* [64-2] at 16.  But regardless of Stingley's conclusory allegations that Brumley's failure to the pay the full Rushing commission was the result of race or gender discrimination, she submits no evidence that would support such a finding.  *See id*. at 13-14.

As for her claim about the cruise, Stingley testified that LaGrange stated he was awarding the cruise "to the highest grossing salesperson" and that she should have been awarded the cruise because she was "salesperson of the month."  [61-5] at 10. She admitted, however, that she did not know whether the salesperson who received

---

*Corr.*, No. 1:18-cv-24-HSO-JCG, 2020 WL 3966064, at *5 (S.D. Miss. July 13, 2020) (discussing cases). Therefore, the Court has chosen to skip over the formality of requiring an amendment and has instead considered the allegation in ruling on the motion.

the cruise was in fact the highest grossing salesperson. *Id.* at 11.  In support of its motion, Mac Haik has submitted the affidavit of Stacey Brown, who explains the criteria for the cruise and states that an African-American male, not Stingley, met the criteria to win.  [61-2] at 2.  Again, Stingley has submitted no evidence to support a finding that the award of the cruise to someone other than her was the result of race or gender discrimination.

Stingley's claims fail under the fourth prong, which requires that she show that someone outside of her protected group and who was similarly situated was treated more favorably. She has failed to establish a comparator for any of these claims, whether the $150 on Tameka Burnett's Hellcat sale, the Rushing commission, or the cruise.  In a disparate treatment case, the plaintiff must show "nearly identical" circumstances for the other employee to be considered similarly situated.  *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 353 (5th Cir. 2007).  Far from showing "nearly identical" circumstances, Stingley has fundamentally failed to present the requisite comparator evidence in relation to any of these claims. For this reason, these claims fail as a matter of law.  *See Nezda v Shell Oil Co.*, 228 F. App'x 375, 376 (5th Cir. 2007) (affirming summary judgment where the plaintiff presented only conclusory allegations that a non-protected individual was treated more favorably).

**C.  Hostile Work Environment**

Title VII prohibits the creation of "a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  To succeed on her hostile work environment claim, Stingley must establish (1) that she belongs to a

protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based upon her protected status; and (4) that the harassment affected a term, condition, or privilege of employment.  *Matherne v. Ruba Mgmt.*, 624 F. App'x 835, 839 (5th Cir. 2015).  "The prohibition does not reach 'conduct that is merely offensive'—it proscribes only 'an environment that a reasonable person would find hostile or abusive.'"  *Id.* (quoting *Harris*, 510 U.S. at 21).  For the harassment to affect a term, condition, or privilege of employment, the work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).

      Stingley advances the following theories in support of her hostile-work-environment claim:  That the hostile work environment was in retaliation for her participation in the Burnett investigation, and that it was the result of race and gender discrimination.  As to the retaliation theory, the Fifth Circuit has not recognized a cause of action under Title VII for a retaliatory hostile work environment.  *Montgomery-Smith v. George*, 810 F. App'x 252, 258 (5th Cir. 2020).  In any event, she has failed to show that participation in the Burnett investigation was a protected activity. Thus, Stingley is left with her argument that she was subjected to a hostile work environment because of her race or gender.

The court finds that Stingley has failed to present a prima facie case on her hostile work environment claim based on her race. The court will, therefore, consider her hostile work environment claim based on her gender.

Stingley has asserted the following behavior on the part of Mac Haik management:  Taylor's statement, in the presence of others, that she would "argue with a f*****g stop sign" and his delays in processing paperwork on her sales; Moody's statement to his wife about Stingley being "the only other woman in his life," his unwanted hug and kiss, his statement to her (when she offered him a handshake) that he wanted a hug, his telling a joke in which the punchline was, "because his balls were sore," and his regularly yelling at her and demeaning her in front of customers and co-workers; LaGrange's failure to do anything about Moody's behavior, his regular use of the "F word," use of the phrase, "balls to the walls," and failure to pass out her bonus checks in sales meeting, his reprimand of her for leaving a trade-in vehicle out front overnight (when not reprimanding a male salesperson for the same thing), and his dismissive attitude about Mike Parker's rude behavior at the Jackson dealership; and Jeans' and Brown's alleged hostility toward her, including Jeans' yelling at her, during the investigation of her complaints. She claims that "because of the male dominated good old boy culture of the dealership, a mere question or suggestion related to a car deal would result in being yelled at and demeaned as if you were too dumb to have insight because you were a woman."  [64] at 9.

16

Defendants argue that these incidents fail to rise to the necessary level of severity and pervasiveness to meet the requirements of a prima facie case.[7]  To determine whether an environment is objectively offensive, courts consider the totality of the circumstances, including the frequency of the conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance.  *Faragher*, 524 U.S. at 787-88.

The court is persuaded that there is at least a factual issue as to whether there was a severe and pervasive hostility toward Stingley, based on her gender, that amounted to a change in the terms or conditions of her employment.  For this reason, the motion is denied as to Stingley's hostile work environment claim based on gender.

## IV.  Conclusion

Stingley has failed to establish a prima facie case for her retaliation, discrimination, and race-based hostile work environment claims.  Accordingly, Defendants' motion for summary judgment is hereby granted as to those claims, and those claims are dismissed with prejudice.  The motion is denied as to her gender-based hostile work environment claim.

So ordered, this the 2nd day of March, 2021.

s/ F. Keith Ball_____<br>
United States Magistrate Judge

---

[7] In their motion, Defendants do not challenge Stingley's contention that the alleged harassment was based upon Stingley's gender.  Therefore, the Court assumes, for the sake of ruling on the motion, that Stingley has met the third prong of the requirements for a prima facie case.

17